directly, Congress granted HHS an unprecedented combination of tools to implement the Inflation Reduction Act's drug pricing program. Together, they grant HHS sweeping and indeed unchecked authority over about half the U.S. drug industry, which is worth about $600 billion a year. The district court erred in granting the government summary judgment on our non-delegation excessive fines and due process claims, and subject to the court's questions, I plan to address the arguments in that order. Two factors combine to make the Inflation Reduction Act the rare statute that violates non-delegation principles. First, the sweep of the authority, and second, the unchecked nature of it, the fact that there's no judicial review, the fact that there's no administrative procedure beforehand. As far as the sweep goes, the principal fact is that even for non-delegation cases, even if you have generally stated a proper rubric under which you can evaluate the cases, cases like Bowles v. Willingham and Consumers Research emphasize that they have to emphasize what the scope of the authority is. In Consumers Research, the court said it would be a problem if you didn't have both the ceiling and the floor to the taxing authority. And in Bowles v. Willingham, the court emphasized there, that case involved a rent control scheme for defense areas, basically around defense contractors' plants. And there, the court emphasized that they did set a floor. They said rents can't be below April 1941 rents. Here, that is lacking. Well, I mean, you've got to deal with FCC. I mean, that's 1944, but FCC is this year, last year. There, the court said sufficient was a floor and a ceiling. Here, you've got maximum fair price. You've got a lot of other intricate parameters that the agency is supposed to use in negotiating that price or setting that initial offer. All those kinds of things are in this framework. How does that survive when FCC, which our court said the combination of the delegations led to a constitutional problem, the Supreme Court squarely rejected that? How does this one survive by contrast? Well, two things. First of all, there, they did set a ceiling and a floor. And here, there isn't a floor. They don't specify what the floor is. They specify a ceiling, but they don't specify a floor. And even though they do say a maximum fair price, the government basically hasn't argued that the fair is actually a standard you judge it by, because they've been facing First Amendment concerns. They've been trying to say, oh, fair is just a word in a statute. You know, it doesn't really have any independent meaning. And so I think that that doesn't really provide guidance in how and what price has to be set. In addition, there's this wholly separate part, the fact that there is no judicial review, because at that point, it means it's basically just a delegation to the agency to do whatever it wants. Well, but, I mean, Congress can curb courts' jurisdiction. That's well established. It is true, but, I mean, the government can't point to any instance where they've, where there's been a delegation this broad that is subject to a bar on judicial review. But the plaintiffs can't point to any authority that says, well, judicial review is key, and if you don't have it, there is a nondelegation problem. I disagree. If you look at Bowles v. Willingham, there the court had about four paragraphs on nondelegation doctrine, an introduction and a conclusion, and it had one paragraph each on what Congress has to do in order to avoid giving up its, its function. And then it emphasized judicial review. And what it said there was, um, the standards prescribed by the Act are adequate for a judicial review which has been accorded. And it said right after that, so far as delegation of authority is concerned, the rent control provisions of this Act meet the requirements held to be adequate for peacetime legislation. It was essential in that ruling that there was judicial review to make sure that they acted within the statutory limits. Also, Toobie v. United States, I think Justice Marshall's concurring opinion says, as the court notes, judicial review perfects a delegated lawmaking scheme by assuring that the exercise of such power remains within statutory bounds. And we have a very compelling illustration in this case of why that's necessary. Congress couldn't have been clearer. You can be as clear as you want, but without judicial review, it's essentially unchecked delegation of authority. Congress said, clear as day, you have ten drugs the first year. And the drugs are tied to new drug applications. That's how they defined negotiation eligible drugs. The agency redefined that to say, we're going to count everything that has the same act of moiety as one drug. Moiety doesn't appear anywhere in the 273-page Inflation Reduction Act. And because of that, they said, Novo Nordisk has six drugs. We're going to count that as one. So in the first year, they had 15 drugs. And you know, when basically the agency gets to redefine that, it means there's no limit on the delegation to the agency. Why that is important, because that's the kind of decision, what counts as a drug, you want that Congress making that kind of decision, because there's a lot of policy baked into that. Because if you say, six drugs are one drugs, it kills all the incentive to basically say, Hey, this is a very useful drug. What else will this molecule do? Because if it's all going to be swept together, you aren't going to put the additional billions of dollars of research. Well, those are all policy arguments. For non-delegation, all the Supreme Court has said, I thought, was that Congress has to give an intelligible principle. That's clearly met here. I think two things about that. You not only need, I mean, an intelligible principle, yes, but Bowles v. Willingham says you have to basically set limits on what the delegation is. Secondly, again, intelligible principles don't mean a thing. You can be as clear as day, you can say 10 drugs, but if you don't have judicial review, that turns into 15. That may be a very attractive theory, but there's no case that says that. You cite Justice Kavanaugh's concurrence here, and there's a separate opinion there. Again, it's going to upholding a delegation where there is judicial review, but the converse, there's no judicial review, so there's a delegation problem. That case doesn't exist. The reason why that case doesn't exist is because in 236 years of the Federal Republic, Congress hasn't seemed to do that before. CELA law stands for the proposition that novelty is an indication that something is constitutionally suspect. Again, the government can't point to a case where somebody's been delegated this kind of authority and not been subject to judicial review. I think that the very absence of that is a compelling indication of a problem here. To take an example of the kind of things that are normally subject to judicial bars are things like the U.S. Anesthesia Partners case that you, Judge Wilson, just handed down earlier this year in January, because there, it was a very minor part of one segment of reimbursement under Part B. It involved not an entire industry, but involved a particular provider. It was a specific formula that was provided by Congress in the statute. It wasn't just fairness or whatever. It was like a percentage of a prior year's thing. And it applied rules adopted through notice and comment. And there was even a little bit of administrative review for one particular factor. That's the kind of judicial bars that courts have upheld in the past. Again, the government hasn't pointed to any other instance where you've had this kind of sweeping authority and then said, sorry, courts don't get to weigh in on that. You have your other arguments that you're going to. I guess I'm still along the lines of the questions you've had so far. I do see judicial review as a check on executive power, retaliation, targeting, commandeering. It doesn't really speak to whether there's been a loss, a surrender of legislative power. I disagree, because... Back to Bowles. Because basically, you can say, here are these very, very specific facts that you've got to apply, or these very specific rules that the agency has to apply. But without the check of judicial review, you're basically saying, you decide what you want. Because it's up to the agency to decide what's fair. It's up to the agency to decide how many drugs to cover. All of those things. It's an intimate part of the delegation when you say it's not going to be subject to judicial review. It's like, we're going to just trust you on this. Secondly, the heart of the drug pricing program is really the excise tax. That is the enforcement mechanism whereby, basically, they can more or less force drug companies to accept whatever price they adopt. Nobody really disputes that deterrence is enough to make something punitive, to make something subject to the excessive fines clause. Austin v. The United States was very clear that as long as something is at least in part to deter, that counts as punishment. Yeah, but you've got the Anti-Injunction Act to hurdle. And it's well established that Congress can tax based on regulatory aims or social engineering or behavioral engineering. They do it all the time. So how do you get past that bar to our jurisdiction? A couple of reasons. First of all, I think there's a decent argument to be made here that the Anti-Injunction Act doesn't bar this kind of suit. Because in a real sense, it is not a suit for the purpose of restraining the assessment or collection of the tax. Well, it's a decent argument, perhaps, but it's been rejected almost everywhere. I mean, not even in the parallel litigation that's going on, because there are several circuits that have handed down adverse decisions on this point. But basically, what the Supreme Court's instructed is if Congress calls it a tax, we treat it as a tax. That is true for Anti-Injunction Act purposes. But still, you have to look at what tax we're talking about here. The whole point of the tax here is to make it unpayable. It will be a failure. The Congressional Budget Office said this tax will never be paid. It's going to have zero revenue effect, because the whole point of it— What's your authority to support that argument? It may be a good argument, but isn't it precluded by precedent? I think there's no precedent on that point, again, because there's never been a tax this high. The highest excise tax I've ever been able to find is the tax on cigars, which is 52%, capping at 40 cents a cigar. Or the machine gun tax, which was a $200 tax imposed in 1934 that was 100% tax on Thompson submachine guns. It dropped to more like 5% or 10% by that before it was eventually phased out. But again, there's never been a tax this high. It's 186% going to 1,900%. Classic common law deterrence is trouble damages. In the book of Genesis, Old Testament deterrence is sevenfold. If you do something, it will be avenged sevenfold. Let's say you get past the Anti-Injunction Act, though. What's the circuit case that's extended often to a situation that's neither criminal nor even has any underlying wrongdoing? Well, I think you don't need a circuit case. I think you can get there from Bajor Kajian, because Bajor Kajian was a case where it was a $350,000 forfeiture, and the court there emphasized how little criminality there was there. It wasn't gotten through illegal means. It wasn't going to be used for something illegal. It isn't even illegal to take money out of the country. It's just illegal to take it out without declaring it. The government's theory is that if there hadn't even been that little nub of criminality, then the government could have kept the $350,000. It's ironic, but it all seems to be in that. But again, the idea that you can punish something because it's not criminal, it's topsy-turvy. It is topsy-turvy. And I think one thing you can look to there is the Tyler v. Hennepin County case. That was a takings case involving the forfeiture of a house to pay a tax debt. That case went off on takings grounds, but Justice Gorsuch, joined by Justice Jackson, wrote separately to say, well, a focus on culpability can sometimes make a provision look more like punishment. This court has never endorsed the converse view. Essentially, an absence of culpability doesn't mean it's not punishment. And he wrote there, economic penalties imposed to deter noncompliance with the law are fines by any other name, and the Constitution has something to say about them. They cannot be excessive. On Friday, the court granted cert in Pung v. Isabella County, Michigan, where they're going to be addressing whether forfeiture of a house for a much smaller tax debt can be constitutionally excessive. So we should know by June whether there is anything to this. But I do think that you can take notice of the fact that in Bajikagian, the thing that is disproportionate is the absence of culpability in the conduct. And again, the government's theory— Just because of time, the argument that's gotten the most traction in our court, NICO 1, is your due process argument. And there I see lack of judicial review and no notice and comment as a significant, somewhat alarming circumstance. So what do you draw from NICO 1, and how do you respond to just the obvious answer courts seem to be giving you, which is it's voluntary? I think that, again, a complete answer to the voluntariness argument is Bowles v. Willingham again. That was a case involving a rent control scheme, and the first argument that they made was that's a taking. And they didn't even devote a full paragraph to that. They just said it's voluntary. It's not a taking because it's voluntary. But they still went through all the analysis of due process in that, suggesting that voluntariness doesn't really matter for due process. That is consistent with cases like Goldberg v. Kelly and Matthews v. Eldridge, for that matter. Those were voluntary programs. Nobody was forcing people to be in those programs, but they still said you've got to give process before you make changes to the program or in applying them. Just as a panel, though, why wouldn't we be bound by our Shaw decision that the dissent cited NICO 1? Participation in a federal Medicare program is not a property interest. Which is this case? The Shaw v. Azar decision. I'm sorry. I'm not familiar with it. But, I mean, it's like participation in Medicare is not a property interest? Is not a protected property interest. Well, in any event, I would just go with NICA just because it's only a year old. And there the court indicated that there was for providers to have a property interest and basically that the rule and having compensation decided not on arbitrary terms. Well, but that's for standing. That was, well, didn't that go off on standing? That was just very preliminary. That's different than the merits. It went off on standing, but I think that there is still, you know, that's still what the reasoning was, that there was a property interest there. And it spoke more broadly than just standing. And you can always look at Rock River where they again said that there was a due process interest for a provider there in Medicare. This is our last case of the day. We have maybe not allowed you to cover all you wanted. If we give you five more minutes, the other side as well, would that be helpful? You know, I'm happy to answer any questions you have, but I think I've made it through my sort of set spiel there. I don't want you to enlarge your spiel. Oh, I didn't get to my laugh line, though, which was that what we're talking about here is literally triple Old Testament damages. I mean, it's almost 21-fold, but I mean, at 19 percent, it is very close to that. And we have not found any time in history where that kind of penalty has been imposed, and certainly not for conduct which the government agrees is lawful. All right, counsel. Good morning. May it please the Court, Max Vivaldi for the government. Are you riding the circuit in all these cases? I am, actually, Your Honor. This is, I think, my third direct press negotiation argument of the year. You handled the third circuit case? I did not. My colleagues handled those, but as the Court knows, we have now all of those have been resolved in the government's favor, and so all of these issues . . . We know. Yes. When's the government response due to the cert petition? The first cert petition was filed recently. The SGA got a 30-day extension, so I think middle of November, early, mid-November, but that may also depend on . . . The only issue that . . . that was AstraZeneca, and the only issue the petition presented was a due process claim. A due process. Starting there, are we bound by NECA 1 and its analysis of due process? So, I think that decision was a standing decision, and on standing, you assume that the plaintiffs prevail on the merits, and then decide whether they've stated a claim. And, you know, while the government disagreed, the Court said, yes, if we assume your view of the merits, you've stated a due process claim. But here, on the merits, you don't assume their view of the merits, and there's just not a protected property interest here for any of the three groups, the three pages. We'll probe that, but if there were, if we were to find a protected property interest, you haven't briefed the Matthews factors, would you agree there's no adequate process given? It's . . . I mean, in that there's not process, yes. Notice of front-end process or back-end process. Yes. We've not contested that . . . Okay. So, it turns on not being a protected interest. Not being a protected interest and not being a deprivation as well. So, you know, we can take them in any order you like. I think the easiest one is the patients. No court has ever recognized a protected interest in access to drugs. The plaintiffs are asking you to invent a new substantive liberty interest, and not doing any of the analysis they would need to do to get there. When it comes to the providers, they do have some interest when they've provided drugs and being reimbursed according to the statutory formula. Let's say they object both to the drug selection and the price given, down to a dollar. Where do you go? How do they get to vindicate their objection? I'm sorry, to the . . . The manufacturers, the plaintiffs here, if they want to say, okay, don't include that drug or, gosh, give us more than a dollar. So, if the manufacturer has, you know, the manufacturer has the negotiation process where they make counteroffers and they can discuss, you know, they can decide whether they're willing to accept an offer or not, at which point they can, you know, walk away or . . . Yeah, but predicate to that is the selection of these drugs, the designation of the drug. And you've got this issue that counsel opposite raised that, well, one drug equals six drugs, really, because they're all similarly related drugs. Where do they go to make that challenge? So that challenge they don't go to raise. They go nowhere, right? Nowhere. So, if the agency just says one drug equals six and that's the way it is, how arbitrary can the agency be before there's some problem? I mean, how is that remedied? So, Your Honor, I guess let me . . . can I . . . let me take a step back. And I want to make it clear that when I said that there was an interest in getting paid for at the statutory rate, I was talking about providers like NICA and Plan B. So I just want to make sure that that's clear. When we're talking about manufacturers, Congress set out a statute. The agency is required to follow the statute. The agency, just like courts, has an obligation to adhere to the law. But the agency says one drug equals six. With respect . . . How do we know that the agency has respected Congress's law? With respect, Your Honor, I mean, that's the example to keep pointing to. The facts just don't bear that out. What Congress said is regardless of packaging or dosage strength or, you know, extended release formulation, treat drugs the same. What we're talking about here when they say there's six drugs, you have one drug that's available in a normal formulation and a rapid release in three different packages. That's a great story and a great rationale, but nobody gets to test that but the agency. That's correct, Your Honor. Nobody gets to hear the other side of the story. So . . . Nobody gets to challenge the science. The manufacturers or any other litigant because the agency just says it. It's obvious. It comports with Congress's will because we say it does. So Congress has the prerogative to preclude judicial review. That is sort of . . . I understand that, but Congress can't pass a patently unconstitutional statute and say, and the court shall not have jurisdiction to review this law. Can they? Well, we have not taken the position that constitutional claims are barred. That's why we don't think this entire challenge is barred. Constitutional claims can be raised. But Congress can't do that. In other words, there are limits on their ability to prescribe a court's jurisdiction to review what they've done. The Supreme Court has never addressed what those limits are, but it is assumed that there would be a problem if Congress transgressed some limits, yes. Well, what if they've transgressed the limits here? I mean, is that a non-delegation problem? Is that some other problem? So I think it's very much not a non-delegation problem. Well, why not? Because in non-delegation, what the Supreme Court said in American Trucking was that in a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency, and that's why in American Trucking, the sort of limited construction that the agency put on the statute was irrelevant. How the agency interpreted it is irrelevant. That secondary question didn't matter. Here we have a tertiary question, not whether Congress delegated legislative power, not how the agency has interpreted the grant of power, but what remedies might exist if the agency transgresses the limits. Those just don't operate on the same axes. But it does operate on due process. So on due process. In other words, correct me if this is an unfair characterization, but the government's saying keep making these valuable, crucial, valuable drugs. You keep making them, and go ahead and keep patenting them, but we're going to tell you the price that you can charge in the private sector. These aren't items we're purchasing. It's the price you'll charge. I guess that seems exceptional, even more compounded by you don't get to talk to us at the beginning, notice and comment, and you can't review, so I'll throw a case at you to give you something to grab onto, Dearborn, that authority that they say that in the private free market, only people get to set the prices for the items that they produce. Yes, Your Honor. Let me start with the premise that the government is setting the prices in the free market, because that's just in the private market. That's not what's happening. So Part B and Part D. Part B, the government is directly reimbursing providers. The government is, the providers are, the doctor is administering the drug, submitting a claim to CMS, and CMS is cutting a check. That is what's happening there. Part D, it's slightly more complicated because there's some intermediaries, but the government pays for 75% of the drugs, of costs within a Part D plan, and all the government is doing is saying that if you want to use Part D benefits to pay for the drugs, these are the conditions under which you can use the benefits, and one of the conditions is that the drug has to be offered at this price. We are not setting the price for anyone who has private insurance or anyone outside that system. We're also not even setting the price for any individual patient. If a Part D beneficiary, for whatever reason, doesn't want to use Part D benefits, they pay whatever price the manufacturer wants to set. We're just setting the price for what the government is willing to pay as part of this government spending program. When it comes to analog, the history and tradition, what would you point to as the closest non-wartime price regulatory scheme? Is there one, or is this a really new concoction? I would say the closest analog is what the government does all the time when it comes to, say, it makes procurement decisions and decides how much it's going to pay. Recently, the government sometimes will offer a subsidy. If you buy a more fuel-efficient car, it will give you a tax credit, but only if the sticker price of the car is less than a certain number. That's a policy choice that Congress can make when it's trying to protect the fiscal side, how much it wants to spend. When it comes to Old Dearborn, so Old Dearborn relies on this line of cases with Ribnick and this whole line of sort of Lochner-era cases, and the Supreme Court recognized in Olsen v. Nebraska a few years later that those were no longer good law. This freestanding right to set prices as an incident of property just does not exist. It's not so much that I don't think their argument is that they want to set prices how they want to set prices. I mean, the market was what did this before this. It's that they want prices set in a non-arbitrary fashion, which does implicate due process, and particularly when there's no notice and comment before this is done. There's sort of a here's our offer, and you can counter it. And by the way, we'll make another offer. We'll negotiate. But basically it's a take it or leave it kind of thing, and there's no review of any of this on the back end. So don't they have an interest in having this program done in a non-arbitrary fashion? I don't understand plaintiffs who advance an argument that this is arbitrary in the constitutional sense, in the substantive due process sense, and, you know, for good reason, because that is an extraordinarily high standard. But there's no due process at all. There's no process at all. So, Your Honor, again, to get to that point in the analysis, there would have to be a deprivation of a protected interest, and I don't think there's a property right here. And there's not a deprivation when, and this is where the vault. Are you familiar with the Shaw case? Yes, Your Honor. Would you say we're bound by that for that proposition, or it isn't binding? I mean, I think you're bound by it. Plaintiffs haven't attempted to distinguish it, and I think it's clear that there's not property rights here, in the same way that there's another case, sorry, I can't remember the name of it, that we have in our brief about supplying adult diapers to nursing homes, where the court says, even if you've supplied these products and you're entitled to payment, if the regulation that CMS has issued says, well, they can hold back payment until you, they can hold back, CMS can hold back payment until it's investigated allegations of fraud, and this is personal care products versus Hawkins is the case, you don't have a property right, a deprivation of property in, like, the fact that this money you're owed has been held back because there's a regulation. Your right to it comes, for providers, from the statute. And the statute, you know, the, that's what we're talking about here. The Hardiman dissent, in the takings clause context, did say they can't exit, it's not voluntary. Yes, Your Honor. His analysis was based on reading, there's two ways to get out of, for a drug manufacturer to get out of its participation in Medicare. One is, if it wants out and CMS does not want to let it out, it has to go through a process and it can take something like 13 months. There's another option when CMS says, we want you out, and that takes 30 days. And CMS has said, if you don't want to participate in this program, we will find good cause to unilateral, to remove you from the program, if you can get out within 30 days. I would also suggest here, with many other, many other places in this statute, you know, plaintiffs have tried to find the reading of the statute that renders this statute unconstitutional. We don't think you need constitutional avoidance to get here, but if you think both those readings are reasonable, the court has an obligation to accept the one that avoids the constitutional problem, rather than the one that creates one. When does an excise tax become confiscatory penalty? So there's no case holding that a tax is a penalty subject to the excessive fines clause. The Eighth Amendment deals with excessive bail, excessive fines, and cruel and unusual punishment, and the Supreme Court has told us that these things together restrict the criminal process. There's no criminal culpability here. But you heard the irony, or the topsy-turvy comment. You get protection if you're criminal, but you don't if you're behaving civilly? So I think if you had a case where there was, you know, some sort of criminal-like scienter, civil fraud, you might be closer here. We're not talking about that. But I also think there's a misconception about how this tax works and what the amount of the tax is, and I'd like to try to clear it up. So you have a formula that says there's an applicable percentage between 65% and 95%, and the tax is calculated based on that. And plaintiffs try to say the number is higher because they're looking at sort of the percentage they get. But as IRS has explained very clearly, the IRS is going to assume that the price you invoice is inclusive of the tax. So if you invoice $100, IRS will look at that and allocate, say, $65 to the tax and $35 to the amount that they keep, the price. But it's 65% to 95% of the total amount charged. But here's the crucial thing. The amount of the tax the manufacturer gets to collect is revenue as well. So the idea that they can't pay it or that it exceeds the amount they're collecting or anything like that just isn't true because they get to collect the amount of the tax too from the pharmacy or whomever and then pay that money to the government if the tax comes into effect. So this range of 65% to 95% isn't punitive, isn't confiscatory. It is remedial, and it's remedial because it serves the purpose of trying to deal with what the government understands to be a dramatically escalating cost of prescription drugs. I'll note that in the first round of negotiations, some of these drug prices came down 79%, 76%. So the idea that this range of 65% to 95% is totally excessive in relation to the problem the government is trying to remedy I think just isn't true. But then how do they come up with the 186% to 1,900%? So it's the difference between price and amount charged. So it is 186% to 1,900% of the price, but in this case price meaning the amount that the company keeps. So if you were to look at, say, a charge of $100 at the 95% rate. Basically the drug price is $35, but they've got to pay a $65 tax on that. The amount they keep is $35. The amount they invoice, they charge, they get to charge is $100. Well, no, I get that in terms of a sales tax. It's $107, but 7% is the sales tax. $7 goes to the state and $100 goes for the price of the good. In other words, if the drug's price is $100, then the tax is, well, I can't do math that quickly, but it's going to be over $200 and something. So that's where they get the 186% effective rate. So the manufacturer has the option if they want to. If they say, we were getting $100 before, we still want to get $100. We will invoice this as $100 to us, $1,900 to the government, $2,000 total payable. They have that option. $100 and $1,900 to the government. Right. They have that option. So they say this is three times the highest biblical tax in all creation. Is this the highest tax that the U.S. government has ever enacted? So if we're talking about of the total revenue they take in from this, 95%? I'm talking about the tax rate. So, Your Honor, I— You just said it was 1,900%. I said that if you were to calculate it based on that ratio of the amount that they keep versus the amount the government keeps, then that would be the number you get. That's a fair— But that's what the tax rate is then, isn't it? I suppose, but if—so if you were to look at it, I think the closest analog would be rates of taxation during, like, the Korean War and World War II, the top marginal rate was something like 94%. This is 1,900%. Well, but, Your Honor, if you get a dollar at the 94% marginal tax rate, you keep 6 cents and the government takes 94. That's the same—that's the appropriate analogy. Here you would keep 5%. The government would keep 95%. The idea that the rate is 1,900% I think is kind of meaningless because it doesn't account for the revenue that you get to collect from— Well, it's not meaningless to the extent that what they say is no one's ever going to pay this tax and no one can challenge the tax. The district court sort of just waved its hand at this and said, Well, you can pay the tax on one of these pills, and then you challenge it. And so that's easy. It's completely payable. You can do it the traditional way. I'm talking about the Anti-Injunction Act now. But that's not accurate, really, is it? Because if you pay the tax on the one pill but during the appeal you deal with 100,000 more pills, if the provider, the manufacturer, loses that appeal, their company shutters at that point. It's closed. In other words, it's so prohibitive that nobody's ever going to take that risk. So I'm not—again, if you—if they are collecting— if they collect both the—they collect this amount of money, it might be prudent for them to escrow 65% to 95% of it. Well, okay, but to collect that amount of money, somebody's got to pay that amount of money. Nobody's going to pay that amount of money. If they increase the price, sure. But if they invoice—if the price is $100 and they continue invoicing $100 and then the amount they owe is $65 to $95, they don't need to charge $2,000, right? That would be a choice they would make if they said, our share is not going to go down. We'll make the—we'll rejigger the amount we charge. Doesn't that completely ignore business reality? I mean, they can't keep operating when the tax that the government takes puts them below the marginal cost to produce the next pill. So I don't—I don't know what the marginal cost is. Well, I guarantee you it's probably a little more than, you know, 5% or whatever they're left with. Yeah, Your Honor, I don't know. But, again, this is a facial constitutional challenge. They say no one could ever pay for a drug company that manufactures lots of drugs. Well, we didn't even get there, though, because the district court said, no problem, the Anti-Injunction Act, they can pay the tax and then challenge it. But I'm just challenging that because it seems completely infeasible to do that with regard to this tax, which maybe makes it different than any other tax that's ever been dealt with. Again, is—there is no case out there that says that where Congress has created jurisdiction to seek a—to have a refund action that you can get around it by saying the amount of the tax is too high. The cases like— Yes, but has there ever been a tax that no one could afford to pay? Not just the particular taxpayer, that no one could— I don't know, Your Honor, but what I'm trying to explain is that this isn't that tax. I don't think there's nothing to demonstrate that there is no manufacturer that could, for one of its drugs, for sales within Medicare, could— I made this offer to opposing counsel off as you—this is our last case. If you have more you want to say, I know my colleague has at least one question. I appreciate that. You can start with the question, and then you can say where you are. I'm happy to entertain whatever questions you have. There are heavy emphases in oral argument today and in the cert petition on bulls and right fixing. Rent fixing implicates a property interest, requires some judicial process. Yes, so, Your Honor, that is a case where the government was setting the prices that could be charged basically an entire—economy-wide and entire cities, more or less. It was not a case where the government was saying, this is all that DOD will pay when it rents space for barracks. That's the difference. The difference is the vastness? No, the difference is whether the— there is an interest in avoiding sort of a non-confiscatory rate when the government is saying, here's the entire market, not the government regulating how much money it spends on its own spending programs and its own subsidies, but when the government is controlling an entire market and setting prices. Again, on the vastness point, it is a $600 billion market that the government seems to be controlling. If I suggested that vastness was the category, I did not mean to suggest that.  It is not the amount of the size of the market. It is, you know, you could have a potential due process argument if the government said, no one shall sell this niche product in the entire country above this ceiling price. That might create a problem, right? You at least have to do an analysis there because the government is regulating, is using its power as a regulator of commerce to decide how much a product can be sold for. It's a different question when the government is saying, if you want to participate in this program where we will subsidize the cost of people buying drugs, these are the conditions on the subsidy. Okay. And I think that's the key distinction with Bowles. All right, counsel. Thank you. On to the next circuit. You're the last pending case, actually, for the moment. I just would like to make a couple of points. First, about the taxes, the government argues that this is remedial, but I wanted to point out that, as written, the tax isn't based on basically excess profits. It's not based on how much more we're charging than the government wants us to charge. It's not even based on textually on just Medicare. It's based on all revenues from the drug nationwide. And even though the government says, oh, well, we only interpret that as based on Medicare, it is totally contrary to the terms of the statute, and Lord knows when they're no longer on their best behavior whether they will go back to the kind of statutory reading because otherwise there are certain other things, like the fact that you don't include exports on a domestic program and the fact that it stops when you exit Medicare when it would be basically there would be no revenues if you exited Medicare. So, I mean, textually it can only be explained as on all revenues. In addition, when we're talking about just the magnitude... Let me stop you there for just a moment. Judge Hardiman's dissent in the Bristol-Myers case gets into what you're talking about now, how the interpretations by the agency go perhaps beyond what is permissible under the statute. You don't seem to be relying a lot on that in this particular case, but you basically endorse the way Judge Hardiman has interpreted this? I endorse his reading. I mean, it is the reading of the statute, and I think even though the government is taking that interpretation now, query, like, the industry has to make investments based on kind of a long-term view of this, and if the government changes its interpretation and says you had no right to rely on that, you know, totally anti-statutory, anti-textual interpretation, you know, we have to make investment decisions based on where we think this is going to be in 5 years or 10 years. And so the government's kind of best behavior interpretations of the moment don't give us a huge amount of comfort. In addition, when we're just talking about the sort of magnitude, the government argues that essentially because we get to keep any of it, you know, that's good enough, we can get by. But if you look at ROA 793, our experts said that a drug that constitutes 13% of a manufacturer's net revenues, which is true of Eliquis, if you let the tax go for a full year, it will be 100% of net revenues for the manufacturer. That is simply not an affordable number. And I do think it's very telling that even though, you know, they negotiated people down as far as 79%, nobody so far has thought that the better course would be to go ahead and pay the excise tax. Everybody knows that it makes more sense to just go ahead and take whatever price the government will be willing to give you. Secondly, I wanted to talk about in terms of just due process, I wanted to point again to the Bowles case because there the court indicated that they do have a due process interest in essentially in compensation. The government's answer to that is that those are private transactions. But even though the government, but what is going on here, these are private transactions. If you just talk about Medicare Part D, we start out with the manufacturer sells to the wholesaler, private entity. The wholesaler sells to one of 10,000 pharmacies or other parties like that, again, private parties. They sell to one of 68 million beneficiaries, and then they turn around and get reimbursement from one of a few hundred plans. Only there at that fourth step does the government have an interest in there. They have a contract with them. Even that isn't a contract that's based on prices so much as it is per capita. It doesn't say we'll only pay $200 for this drug. It says we'll only give you $1,000 to insure John Elwood for this year for everything he takes. They're involved, but it's like they're controlling a lot of private transactions involving literally millions of private parties to get there. They're acting as a regulator. They're not just acting as a market participant. Then finally, one thing that I think just at every corner in this case is you come up with novelty. The statute is full of novelties, and then the government's behavior afterwards has been full of novelty where they're just interpreting the statute contrary to its plain terms. Again, I just want to point the court to the seal of law. Perhaps the most telling indication of a severe constitutional problem is a lack of historical precedent to support it. There's just absolutely nothing that we've seen in 236 years of the Republic that looks quite like this law. So much novelty. It's a little one-sided against you on the amici. I mean, that's a broad comment, but is there anything just in a little extra time you'd want to say to rebut the various amicus briefs? Is there any crucial point? No, no crucial points. Partly that was the expedited nature of it, and we were topside, and so there was much more balance than the other circuits. Anyway, thank you. All right. Well, that concludes the arguments for this morning.